SC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Justin Fuller,

     Plaintiff,

v.

Christina Lopez, et al.,

     Defendants.

No. CV 19-05818-PHX-DWL (CDB)

**ORDER**

  Plaintiff Justin Fuller, who is a Hawaiian prisoner confined in CoreCivic's Saguaro Correctional Center ("SCC")[1] in Eloy, Arizona, has filed a civil rights complaint pursuant to 42 U.S.C. § 1983 (Doc. 1) through counsel and paid the $400.00 in filing and administrative fees.  Plaintiff has also filed a motion for a preliminary injunction (Doc. 4), a First Amended Complaint (Doc. 5), and an ex parte motion for a temporary restraining order (Doc. 6).  The Court will order Defendants Lopez, Thomas, Griego, and CoreCivic to answer Counts I and II of the First Amended Complaint, dismiss the remaining claim and Defendants without prejudice, and deny the motions.

**I. Statutory Screening of Prisoner Complaints**

  The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28

---

[1] Plaintiff incorrectly states that SCC is owned by the State of Hawaii.  (Doc. 5 ¶ 1.) SCC is owned by CoreCivic, a private corporation.  *See* http://www.core civic.com/facilities/saguaro-correctional-center;  http://ir.corecivic.com/  and http://www.corecivic.com/about/executive-leadership (last accessed Jan. 15, 2020).

U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)-(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

## II. First Amended Complaint

In his three-count First Amended Complaint, Plaintiff alleges claims for sexual assault and failure to protect, supervisory liability for failure to protect, and denial of access to the courts. Plaintiff sues CoreCivic and the following CoreCivic employees at SCC: former Corrections Officer ("CO") Christina Lopez, Warden Todd Thomas, Assistant Warden Ben Griego, Unit Manager ("UTM") J. Guilin, and Sergeants Michael Gawlick and A. Perez. Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief and attorneys' fees and costs.

Plaintiff alleges the following facts:

Over the course of two to three months, Plaintiff and CO Christina Lopez had developed a friendly rapport and Lopez had divulged increasingly personal information about her marriage and personal life to Plaintiff. Even when Plaintiff felt uncomfortable about Lopez discussing personal matters with him, he believed that it was in his best interest to remain friendly with Lopez due to the imbalance of power between them. Plaintiff believes that Lopez mistook his manner towards her as an attraction to her.

On June 8, 2019, Lopez went to the open area of the K-Unit, B-Pod, where Plaintiff was housed. Lopez told Plaintiff that the entire second shift had been told that security cameras were not working. She then told Plaintiff that she intended to have sex with him while the cameras were down. Plaintiff was "caught off guard" by Lopez's statements. (Doc. 5 ¶ 11.) He objected, pointing out the potential severe consequences for them both. Plaintiff did not want to risk increasing his time in prison or make his remaining time in prison—eighteen months—harsher and feared being again placed in disciplinary housing. He told her that he had been imprisoned long enough to know that they would be discovered and reported by other prisoners or seen on camera footage. Lopez brushed aside Plaintiff's concerns and told him again that she wanted to have sex with him. Plaintiff again refused. Lopez repeated that the cameras were not working and would not be working until someone came to the prison to repair the system. Plaintiff responded that he did not believe that the cameras were not working, despite what Lopez's superiors had told staff. He noted that in the past when the cameras did not work, the facility was placed on lock down, which had not happened this time. Lopez again tried to convince Plaintiff that the cameras were inoperable. Plaintiff became increasingly agitated by his fear of being caught and punished with solitary confinement.

Plaintiff then tried to deter Lopez, without provoking her retaliation against him, by reminding her that her divorce was not final. Lopez turned to her personal struggles about her weight and asked whether that was why Plaintiff was refusing. Plaintiff responded, "No, no absolutely not!" (*Id.* ¶ 29.) He repeatedly assured her that his refusal was not because of her weight and told her that he just wanted to be released on time and not be

placed in the Special Housing Unit ("SHU").  Lopez continued to insist that he was refusing to have sex with her because of her weight; Plaintiff attempted to console her and told her she was pretty.  Lopez then began talking about issues with her husband.  Plaintiff reminded Lopez that they were friends and that she could talk to him whenever she needed to, but that having sex in prison was very risky for them both, "even though it is tempting."  (*Id.* ¶ 37.)  At that time, Lopez's eyes "lit up," dismaying Plaintiff because Lopez had not "internaliz[ed]" that he did not want to have sex with her.  (*Id.* ¶¶ 38-39.)  Plaintiff walked away and returned to his cell.

Later that day, between 7:00 and 8:00 p.m., Plaintiff heard Lopez yell that it was "pill call" time.  At about the same time, Plaintiff's cellmate, Jericho Lindsey, was about to use the phone, which was his nightly routine.  As Lindsey left their cell, he told Plaintiff that Lopez was outside putting on latex gloves as though she was about to conduct a cell search.  Plaintiff got on his bunk and put on earbuds to listen to music; Lopez entered his cell, closed the door, and turned off the lights.  Plaintiff leapt from his bunk and asked Lopez if she was crazy and told her she had to leave.  Lopez responded, "Prove it."  (*Id.* ¶ 47.)  Plaintiff said that she was "trippin" and that she needed to leave the cell before they both got into serious trouble.  (*Id.* ¶ 48.)  Lopez moved closer to Plaintiff and said, "Prove it to me that it's not 'cause I'm fat."  (*Id.* ¶ 49.)  Plaintiff told her to immediately leave or they would be reported by other prisoners.  Lopez said the cameras were not recording, so "who cares?"  (*Id.* ¶ 51.)  Plaintiff pleaded with her to leave or she would get them both in serious trouble.  Lopez did not leave, but instead stood in front of Plaintiff mocking him for being scared while telling him not to be scared.  Lopez then grabbed and began rubbing Plaintiff's penis with her hand over his sweat pants and kissing Plaintiff on the neck.  She tried to kiss his mouth, but he turned his head away.  Plaintiff pushed her hand away and again told her to leave.  Lopez unbuckled her duty belt, pulled her pants and underwear down to her knees, and began rubbing herself with one hand.  She told Plaintiff that if he did not have sex with her, she would make his life hell but that she would treat him "like a king" if he had sex with her.  (*Id.* ¶ 58.)  Lopez, still rubbing herself, began groping Plaintiff

again.  She told Plaintiff the ways she would "make life miserable" for him, threatened to write him up every chance she got, and said that he would lose her friendship if he did not have sex with her.  (*Id.* ¶ 59.)  While feeling fear and panic, Plaintiff's penis became erect from Lopez's stimulation.  Plaintiff sat on his locker and Lopez mounted Plaintiff with her back to him and pushed herself onto Plaintiff's penis.  Plaintiff did not move and was repulsed by Lopez's demands to bring her to climax.

Then, they both saw a shadow at the door of someone looking into the cell.  Lopez jumped up and Plaintiff pulled up his pants in fear that they had been discovered.  Plaintiff told her that he had warned her of the risks.  Lopez told Plaintiff to find out who had looked in.  Although reluctant to do so, Lopez told him that if he did not identify the individual outside the cell and instruct that person not to say anything, she would claim that Plaintiff had hidden under his bunk and raped her when she came in to do a cell-search.  Before leaving Plaintiff's cell, Lopez instructed him to get under the bunk to make it look like no one else was in the cell when she entered in case someone saw her leave his cell.  Lopez turned on the cell lights and left, leaving the cell door open.

Plaintiff remained under his bunk.  Moments later, Lindsey returned to the cell and looked puzzled to see Plaintiff there.  Plaintiff told Lindsey to come in and close the door and told Lindsey that Lopez had raped him.  Lindsey told Plaintiff that he had seen a prisoner looking into their cell, who Lindsey identified to Plaintiff.

Plaintiff left their cell to talk to the prisoner identified by Lindsey; Plaintiff told that prisoner that he should not look in other prisoner's cell without consent to avoid arousing suspicions—there had been recent problems with commissary being stolen from cells.  The prisoner responded that he had not seen anything and only wanted to talk to Lopez about pill call.

"[A] while" later, Lopez came to talk to Plaintiff about the prisoner who had looked in on them.  (*Id.* ¶ 89.)  Plaintiff pointed out the prisoner and told her what he had said.  At that point, Plaintiff still feared that Lopez would accuse him of rape as she had threatened and felt that he needed to continue to placate her.  In subsequent days, Lopez brought

Plaintiff her "outside meals," *i.e.,* sandwiches, cookies, and candy.  (*Id.* ¶ 94.)  Plaintiff interpreted these gestures as bribes for his continued silence.  Lopez thanked him for speaking to the other prisoner and generally treated him "like a king."

On June 24, 2019, Plaintiff was summoned by UTM Alexander.  When Plaintiff got to Alexander's office, Lieutenant Perez and Facility Investigator Gawlick were waiting.  They told Plaintiff that they had reviewed video footage and seen a CO enter his cell.  Plaintiff initially denied any knowledge of what they were referring to and then said he would remain silent until he had legal counsel.  Plaintiff was told that he was under investigation for compromising a CO, and he was cuffed and removed from K-Unit.

Plaintiff was stripped of his clothing except his boxer shorts and was placed in a "freezing cold" suicide-watch cell, where he remained for approximately fifteen hours without a blanket or pillow.  (*Id.* ¶ 104.)  The next day, Plaintiff was moved to the segregation unit.[2]  Warden Thomas told Plaintiff that he had been aware that Lopez and Plaintiff had become friendly and said that he was "waiting to catch a bigger fish."  (*Id.* ¶ 109.)  Thomas suggested that Plaintiff had convinced Lopez to bring contraband into the prison for him.[3]

Beginning July 8, 2019, Plaintiff repeatedly tried to use a Prison Rape Elimination Act ("PREA") hotline number, which was posted throughout the facility, to report the assault.  (*Id.* ¶¶ 113-14.)  The number did not work.  After Plaintiff unsuccessfully tried to use the PREA number, staff told him to dial *777 and leave a message.  Plaintiff left a message, although he suspected that it would only reach facility investigators.

The same day, Plaintiff was placed in full restraints and taken to UTM Guilin's office, where Gawlik, Perez, and Griego, and unknown COs were waiting.  Plaintiff was told to sign a piece of paper—without an opportunity to read it—that would be used to prosecute Lopez.  Plaintiff refused to sign without conferring with an attorney and said

---

[2]     Because Plaintiff does not allege that he had been charged with or found guilty of a disciplinary infraction, the Court assumes that he was placed in administrative segregation.

[3]     In the days leading up to Plaintiff's removal from the K-Unit, Lopez told him that she and her belongings had been uncharacteristically searched twice.

they had enough evidence to indict Lopez without his help.  After Plaintiff refused to sign, Perez took the cuffs off Plaintiff's writing hand.  Plaintiff again refused to sign without first conferring with counsel.  Griego and Gawlik got up close to Plaintiff and asked why he did not want to sign the paper.  Plaintiff replied that they were not treating him like a victim and were clearly not on his side.  Gawlik shook his head and said that, "[b]y law we have to treat you like a victim, but you are not a victim." (*Id.* ¶ 122.)  "They" called him a "wannabe gangster" and said that the Hawaiian prison population did not like his "Florida punkass." (*Id.*)  Perez forcefully grabbed Plaintiff from a sitting position to put the cuff back on.  Perez pushed Plaintiff against the desk and yelled at him to "[s]top [r]esisting." (*Id.* ¶ 123.)  Plaintiff, who was not resisting, asked to go back to his cell.  Gawlik told Plaintiff that if he was going to "'play games,' they could play games too." (*Id.* ¶ 125.)

On July 10, 2019, Plaintiff asked Guilin about the voicemail message that Plaintiff had left two days earlier at the *777 number.  Guilin said "they" knew about the message and were investigating the issue. (*Id.* ¶ 126.)  Plaintiff asked to call the PREA hotline again since his previous attempts had been unsuccessful; Guilin responded that he could not make two calls about the same incident.  Later that day, Warden Thomas stopped at Plaintiff's cell and asked how he was doing.  Plaintiff responded that he was being harassed by staff.  Thomas said that meant they were "doing their duties." (*Id.* ¶ 130.)  Plaintiff asked Thomas why they were treating him like a suspect instead of a PREA victim.  Thomas laughed and said that he knew that Plaintiff was not a victim, but he was glad that Lopez was out of his facility.  When Plaintiff tried to explain what happened, Thomas cut him off and told Plaintiff that it was nothing personal, "just business" and walked away. (*Id.* ¶ 132.)

By July 10, 2019, Plaintiff's cell was being searched almost daily,[4] and that day, while Plaintiff was at recreation, an officer told Plaintiff that his cell was being searched. When Plaintiff returned to his cell, he found his cell overturned and his legal documents, including a § 1983 lawsuit packet, gone.  In addition to the cell searches, Plaintiff was not

---

[4]      Plaintiff does not allege over what period his cell was being searched almost daily or how that differed from before the assault.

allowed to add attorney phone numbers to his approved phone call list. Plaintiff was told that he had to prove that the attorney phone numbers were "correct." (*Id.* ¶ 136.) At his own cost, Plaintiff used certified mail to prove that the phone numbers were valid.

On July 15, 2019, Plaintiff asked Guilin why he had been denied leave to add attorney phone numbers. Guilin replied that Plaintiff had to prove that the numbers he wanted to add were for attorneys representing him. Plaintiff again asked to place a PREA "hotline" call since his last attempt had not resulted in him speaking to a PREA advocate. Guilin said that Plaintiff had "already been 'seen'" on July 8 about his PREA message, though Plaintiff had not seen anyone about his assault. (*Id.* ¶ 141.) Plaintiff "felt" that he was being denied the ability to make a PREA report to an outside source. (*Id.* ¶ 142.)

On July 16, 2019, Plaintiff submitted a request to use the facility's law library to research PREA policies. Guilin replied that Hawaii prisoners did not have access to the law library in H-Unit; it was only for Nevada prisoners "per contract." (*Id.* ¶ 144.) Plaintiff submitted a request to place a PREA call to an outside source and threatened to grieve the issue if his request was denied.

On July 24, 2019, Plaintiff was interviewed by Susan Murray in Guilin's office about his PREA claim. Plaintiff recounted Lopez's assault and "the retaliation he had been enduring"[5] after the assault. (*Id.* ¶ 146.) Plaintiff told Murray that he did not feel safe at SCC. Murray gave Plaintiff an inmate handbook with phone numbers for the Southern Arizona Center Against Sexual Assault ("SACASA") and asked Plaintiff to submit a request so that Murray could place the numbers on Plaintiff's approved phone list. Plaintiff did so. Plaintiff alleges on information and belief that SACASA is not a "designated or contracted PREA service provider for SCC."[6] (*Id.* ¶ 149.) Later the same day, Plaintiff

---

[5]     Plaintiff does not allege what "retaliation" he reported to Murray.

[6]     SCC's "Sexual Abuse Prevention and Response," dated February 26, 2013, Policy Number 14-2, provides in part that: "Inmates/residents shall be provided access to outside victim advocates for emotional support services related to sexual abuse by giving inmates/residents mailing addresses and telephone numbers, including toll-free hotline numbers where available, of local, state, or national victim advocacy or rape crisis organizations, and, for persons detained solely for civil immigration purposes, immigrant services agencies. Such information shall be included in the facility's Inmate Handbook. The facility shall enable reasonable communication between inmates/residents and these

was moved to the N-Unit, a transfer that Plaintiff believes was retaliatory without explaining why.

On August 7, 2019, Plaintiff received Guilin's response to Plaintiff's request to grieve the lack of PREA procedures and "due process of access to the courts." (*Id.* ¶ 151.) Guilin responded that Plaintiff had received a handbook on July 24. The same day, Murray notified Plaintiff that the "PREA" numbers had been added to his approved phone numbers list. Plaintiff called the "PREA" number and was connected with Mara Capati at SACASA. Plaintiff spoke to Capati every week for the next few weeks about the assault and was provided names of attorneys, including his current attorney.

On September 10, 2019, when Plaintiff submitted a request to make a "legal call" to Capati, his request was denied. (*Id.* ¶ 156.) Two SCC officials told Plaintiff that they did not understand why the SACASA number was no longer on his approved list. When Plaintiff asked why "legal numbers" that had been on his approved list for more than a month had been removed without notice, Plaintiff was told to submit a request to Murray about staff "still" continuing to make it difficult to receive counseling or pursue legal action concerning the assault. (*Id.* ¶ 159.)

On September 25, 2019, three months after he first requested access, Plaintiff was scheduled to visit the law library. The next day, Warden Thomas came to Plaintiff's cell in the N-Unit and told Plaintiff that he was listening to Plaintiff's calls with his attorney— the attorney who subsequently filed this case. When Plaintiff said that legal calls were confidential, Thomas responded that he could "do what he wanted" and that Thomas's attorneys had told him he could listen to the calls. (*Id.* ¶ 162.)

At some point, Plaintiff's counsel received a "demand letter" from attorney Rachel Love. (*Id.* ¶ 163.) Love confirmed that counsel's calls with Plaintiff were being monitored and Love threatened to suspend all of Plaintiff's calls if Plaintiff's counsel attempted to have third-parties listen in on the calls.

---

organizations and agencies, in as confidential a manner as possible." *See* https://www.corecivic.com/hubfs/_files/PREA/Facilities/Saguaro-14-02.pdf, § 14-2.4(E)(2) (last accessed Jan. 15, 2020).

At some point, Warden Thomas attempted to persuade Plaintiff to drop the case and made clear to Plaintiff that if he persisted in seeking legal relief, Plaintiff would spend the rest of his sentence in solitary confinement.  Thomas told Plaintiff that if he dropped the matter, he would likely be returned to general population.  Thomas warned Plaintiff that lawsuits took a long time and Plaintiff could be left "back here" until 2021, before the case made it to court.  (*Id.* ¶ 164.)

Plaintiff claims that he remains in segregation due to unidentified "fabricated disciplinary charges," and that he was sentenced to 210 days in solitary confinement.  (*Id.* ¶¶ 165-66.)  Plaintiff's cell assignment has changed frequently and coincides with times when Plaintiff has received help from other prisoners.  Plaintiff's access to money has been frozen so that he is unable to buy hygiene items and he has been denied an indigent package, which he was supposed to receive because his account is frozen.  Plaintiff has also been denied phone calls, except for a one-minute call to his family.

In **Count I**, Plaintiff asserts a claim for sexual assault and failure to protect against Defendant Lopez based upon Lopez's coercion of Plaintiff to have sex with her.

In **Count II**, Plaintiff asserts a claim for failure to protect or threat to safety.  Plaintiff alleges that Defendants Thomas and Griego falsely informed second-shift staff that all security cameras at the prison were not working.  On information and belief, Plaintiff asserts the false statements were made and intended to embolden Lopez to act with wanton disregard to Plaintiff's safety and bodily integrity.  He further alleges on information and belief that other staff were implicated and that Thomas and Griego had prior knowledge that illegal or dangerous behavior would ensue that could place prisoners and staff at risk.  He contends Thomas and Griego knew that dangerous and criminal behavior would result from their acts, although they did not specifically know what would happen.  He contends that Thomas and Griego knew of a threat to Plaintiff and failed to act to alleviate the threat.  Plaintiff asserts on information and belief that these acts were part of a policy or practice approved by Defendant CoreCivic.

In **Count III**, Plaintiff asserts a claim that he was denied access to the courts by

Defendants CoreCivic, Gawlik, Perez, and Guilin.  Plaintiff alleges that he was denied access to the courts when "Defendants" failed to have an effective PREA hotline in place, prevented Plaintiff from accessing SACASA by phone, transferred him to impede his ability to receive help from other prisoners, put him in segregation to coerce him into foregoing a lawsuit, and threatened his attorney.  Plaintiff contends that it was his attempt to access legal resources that caused the adverse acts.  He again asserts, on information and belief, that these acts were part of a policy or practice approved by Defendant CoreCivic.

### III.   Failure to State a Claim

To prevail in a § 1983 claim, a plaintiff must show that (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)).  In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

### A.   Defendants Gawlick, Perez, and Guilin

Plaintiff sues SCC Sergeants Gawlik and Perez, and Unit Manager Guilin.  While each of these Defendants may be sued under § 1983, Plaintiff fails to state a claim against any of them.

To state a claim against a defendant, "[a] plaintiff must allege facts, not simply conclusions [to] show that an individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  For an individual to be liable in his or her official capacity, a plaintiff must allege injuries resulting from a policy, practice, or custom of the agency over which that individual has final policy-making authority. *See Cortez v. County of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir. 2002).  In addition, there is no respondeat superior liability under § 1983, so a defendant's position as the supervisor of someone who allegedly violated a plaintiff's constitutional rights,

absent more, does not make him liable. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A supervisor in his personal capacity "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor*, 880 F.2d at 1045. Further, under Ninth Circuit law, a defendant can be liable for failure to act. *Id.* Generally, whether a defendant's denial of administrative grievances is sufficient to state a claim depends on several facts, including whether the alleged constitutional violation was ongoing, *see e.g.*, *Flanory v. Bonn*, 604 F.3d 249, 256 (6th Cir. 2010), and whether the defendant who responded to the grievance had authority to take action to remedy the alleged violation, *see Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009).

### 1. Perez

Plaintiff alleges that Perez was present at the June 24, 2019 meeting. Later that day, after being placed in full restraints, Plaintiff was taken to Guilin's office, where Gawlik, Perez, and Griego were waiting and where Plaintiff refused to sign a piece of paper that was going to be used to prosecute Lopez. After Plaintiff's initial refusal, Perez uncuffed Plaintiff's writing hand. Plaintiff again refused to sign. After Plaintiff told Griego and Gawlik that they were not treating him like a victim and were clearly not on his side, "[t]hey called him a "wannabe gangster," who was not liked by the Hawaiian prison population. (*Id.* ¶ 122.) Perez then "forcefully grabbed" Plaintiff from a sitting position to put the cuff back on, pushed Plaintiff against the desk, and yelled at him to stop resisting. (*Id.* ¶ 123.)

To the extent Plaintiff intended to assert a claim against Perez for excessive force, his allegations are insufficient to state a claim. When an inmate claims that prison officials violated his Eighth Amendment rights by using excessive physical force, the relevant inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). However, the Supreme Court has made it clear that not every use of physical force violates the Eighth Amendment:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.  *See Johnson v. Glick*, 481 F.2d [1028, 1033 (2nd Cir. 1973)] ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

*Id.* at 9.  It is not clear what level of force was used when Perez allegedly pulled Plaintiff out of his chair and pushed him into the table, and it does not appear that Plaintiff suffered any injuries from the incident he describes.  Further, Perez cannot be held liable under § 1983 based solely on verbal harassment, however objectionable his statements may have been.  *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) ("verbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983") (quoting *Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979)); *see also McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) (mere threatening language and gestures do not amount to constitutional violations); *Glick*, 481 F.2d at 1033 n.7(the use of words, no matter how violent, does not constitute a § 1983 violation).  Accordingly, Plaintiff has failed to state a claim against Perez for excessive force.

Plaintiff otherwise asserts that Perez denied Plaintiff access to the courts.  As discussed below, Plaintiff fails to state a claim for denial of access to the courts.  Accordingly, Perez will be dismissed.

### 2.    Gawlik

As with Perez, Plaintiff alleges that Gawlik was present during the interview when Plaintiff was asked to sign a document and Plaintiff refused.  Plaintiff alleges that Gawlik and Griego got close to him and asked why he did not want to sign the paper and that, in response to Plaintiff's reply, Gawlik shook his head and said that although Plaintiff was a victim under the law, he was not really a victim.  Apparently, Gawlik and Griego also called Plaintiff a "wannabe gangster" and told him that the Hawaiian prison population did not like him.  As noted above, allegations of verbal harassment are not sufficient to state a claim under § 1983.

Plaintiff otherwise asserts that Gawlik denied Plaintiff access to the courts.  As

discussed below, Plaintiff fails to state a claim for denial of access to the courts. Accordingly, Gawlik will be dismissed.

### 3.    Guilin

Plaintiff alleges that he was interviewed by others in Guilin's office on July 10 and 24, but he does not allege that Guilin was present or took part in the interviews. Plaintiff also alleges that Guilin denied him leave to call the PREA hotline, told Plaintiff he had to prove that the numbers he was seeking to add to his telephone list were for attorneys representing him, told him he did not have access to the law library in H-Unit, and responded to Plaintiff's grievance regarding a lack of PREA procedures by stating that Plaintiff had received a handbook on July 24.[7]

As discussed below, these allegations are insufficient to state a claim for denial of access to the courts. Accordingly, Guilin will be dismissed.

### B.    PREA

"[P]risoners have a right to be free from sexual abuse," *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004), but there is no private cause of action for violations of PREA.[8]

---

[7]      Plaintiff does not allege that he was denied access to the grievance process.

[8]      As stated in *Grindling v. Diana*, 2016 WL 6080825, *3-4 (D. Haw. 2016):

Congress enacted PREA to address the problem of prison rape by: "(1) developing national standards for the detection, prevention, reduction, and punishment of prison rape"; (2) applying such national standards to governmental agencies and departments that maintain correctional facilities; and (3) conditioning eligibility for federal grant money on compliance with such standards.  42 U.S.C. §§ 15602, 15605; *see, e.g., Diamond v. Allen*, 2014 WL 6461730, at *4 (M.D. Ga. Nov. 17, 2014); *Holloway v. Dep't of Corr.*, 2013 WL 628648, at *2 (D. Conn. Feb. 20, 2013); *Jones v. Schofield*, 2009 WL 902154, at *2 (M.D. Ga. Mar. 30, 2009) ("A reading of [PREA] makes clear that its goal is to lessen the occurrence of rapes in prisons across this Country.  Its focus concentrates on statistics, standards, developing information, and regulating federal funding in an effort to lessen prison rapes.").

The PREA creates a scheme which requires institutional compliance with stated Congressional goals in exchange for federal funding.  *See generally*, 42 U.S.C. §§ 15602, 15605.  The PREA does not "explicitly or implicitly suggest[] that Congress intended to create a private right of action

*Hatcher v. Harrington*, 2015 WL 474313, *5 (D. Haw. 2015) (citing cases that have similarly found that PREA does not create a private cause of action). Thus, to the extent Plaintiff claims Defendants violated PREA or failed to follow PREA's requirements, he fails to state a claim for relief.

## C.    Access to the Courts

Plaintiff designates Count III as a claim for denial of access to the courts. The right of meaningful access to the courts prohibits officials from actively interfering with inmates' attempts to prepare or file legal documents. *Lewis v. Casey*, 518 U.S. 343, 350 (1996). The right of access to the courts is only a right to bring petitions or complaints to federal court and not a right to discover such claims or even to ligate them effectively once filed with a court. *Id.* at 354. The right "guarantees no particular methodology but rather the conferral of a capability–the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Id.* at 356.

As a matter of standing, for an access-to-courts claim, a plaintiff must show that he suffered an "actual injury" with respect to contemplated litigation. *Id.* at 349. To show actual injury with respect to contemplated litigation, the plaintiff must demonstrate that the defendants' conduct frustrated or impeded him from bringing to court a nonfrivolous claim that he wished to present. *Id.* at 352-53. In addition to identifying "a nonfrivolous, arguable underlying claim," the underlying claim "must be described in the complaint." *Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002). Further, "the injury requirement is

for inmates to sue prison officials for noncompliance with the Act." *Hatcher,* 2015 WL 474313, at *5; *see Amaker v. Fischer,* 2014 WL 4772202, at *14 (W.D.N.Y. Sept. 24, 2014). "Nor does the PREA's language, structure, context, or legislative history suggest that Congress intended to create a private remedy for noncompliance with the PREA." *Hatcher*, 2015 WL 474313, at *5; *see* 42 U.S.C. § 15607(e) (explicitly directing the Attorney General to enforce compliance with the PREA); *see also Alexander*, 532 U.S. at 286 (explaining that absent Congressional intent "to create not just a private right but also a private remedy . . . no private right of action exists."). Significantly, "every court to address the issue has determined that PREA cannot support such a cause of action by an inmate." *Amaker,* 2014 WL 4772202, at *14.

not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. The right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id*. at 355. The nonfrivolous claim must be a direct or collateral attack on the inmate's sentence or a challenge to the conditions of his confinement. *Id.* "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*. (emphasis in original).

Plaintiff asserts in Count III that he was denied access to the courts by Defendants CoreCivic, Gawlik, Perez, and Guilin, who allegedly failed to have an effective PREA hotline in place, denied him the ability to call the hotline once he had left a voicemail, prevented him from accessing SACASA, moved him to impede his ability to get help from other prisoners, denied him access to a law library, put him in segregation to coerce him into forgoing legal action, and threatened his attorney. Plaintiff contends that it was his attempt to access legal resources that caused the adverse acts and asserts on information and belief that these acts were part of a policy or practice approved by CoreCivic. (*Id.* ¶ 190.)

As discussed above, PREA does not afford a private cause of action or provide a private cause of action for prisons that fail to have a PREA hotline in place. Further, Plaintiff fails to allege an actual injury or facts to support that he was denied the ability to present a nonfrivolous claim in court. Accordingly, Count III will be dismissed.

### D.    Retaliation

Plaintiff has not included a count for retaliation but asserts that he was and is subject to retaliation. A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v.*

*Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claims requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest"). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff claims that he remains in segregation due to "fabricated disciplinary charges" for which he was sanctioned to 210 days in solitary confinement. Plaintiff fails to describe what he was charged with or to allege facts to support that the charges were "fabricated." Nor does Plaintiff allege facts to support that the sanction was atypical or significant or that he was denied due process.

Plaintiff also asserts that his cell assignment has frequently changed and that the changes coincide with times when Plaintiff has gotten help from other prisoners. Prisoners do not have a constitutional right to be confined in a particular facility and may be transferred for any constitutionally permissible reason or for no reason at all. *Meachum v. Fano*, 427 U.S. 215, 225 (1976); *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995); *Shango v. Jurich*, 681 F.2d 1091, 1100 (7th Cir.1982); *Rizzo v. Dawson*, 778 F.2d 527, 530-31 (9th Cir. 1985); *see also Montanye v. Haymes*, 427 U.S. 236, 242 (1976). Plaintiff fails to allege facts to support that any transfer was in retaliation for Plaintiff exercising constitutionally protected rights.

Plaintiff also alleges that his access to money in his inmate account has been frozen so that he is unable to buy hygiene items and he has been denied an indigent package, which he is supposed to receive because his account is frozen. Plaintiff does not indicate whether access to his inmate account was frozen due to his disciplinary charges and he does not allege facts to support when and who denied him an indigent hygiene package or

facts to support that the denial was in retaliation for Plaintiff exercising any constitutional right, rather than, for example, negligence.

Finally, Plaintiff alleges that he has also been denied phone calls, except for a one-minute call to his family.  Plaintiff does not allege whether he lost phone privileges as the result of disciplinary sanctions, for how long, by whom, or facts to support that he has been denied phone privileges in retaliation for exercising his constitutional rights.  Therefore, to the extent Plaintiff asserts a claim for retaliation, he fails to state a claim.

**IV.   Claims for Which an Answer Will be Required**

Liberally construed, Plaintiff sufficiently states a claim for threat to safety against Defendant Lopez in Count I.  Similarly, liberally construed, Plaintiff sufficiently states a claim for failure to protect or threat to safety against Defendants CoreCivic, Thomas, and Griego in Count II.  These Defendants will be required to respond to Counts I and II of the Complaint.

**V.   Motions for Injunctive Relief**

As noted above, Plaintiff filed a motion for a preliminary injunction and later filed a motion for a temporary restraining order ("TRO").  In both motions, Plaintiff seeks an order requiring that he be moved to a facility that is not controlled by any Defendant in this case.

A party seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co*., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The Ninth Circuit has also concluded that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after *Winter*.  Under that test, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious

questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). Where a movant seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

Unlike a preliminary injunction, *see* Fed. R. Civ. P. 65(a), a temporary restraining order may be entered "without written or oral notice to the adverse party." Fed. R. Civ. P. 65(b). A TRO may issue "only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant *before* the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b) (emphasis added).

Plaintiff asks the Court to require that he be moved to a different facility because of alleged retaliation. As discussed above, Plaintiff did not assert a count for retaliation in his First Amended Complaint and he has not otherwise alleged facts to support such a claim. Plaintiff also has not alleged specific facts in his motions or his First Amended Complaint to support entry of an injunction, with or without notice. Consequently, Plaintiff fails to establish a likelihood of success on the merits of a retaliation claim or serious questions going to the merits were raised and the balance of hardships tips sharply in his favor.

Moreover, Plaintiff is a Hawaii prisoner. Hawaii contracted with CoreCivic to house some of its prisoners and caused Plaintiff to be transferred to SCC. Plaintiff fails to cite any authority to support that a district court in Arizona can order the State of Hawaii to transfer Plaintiff to another facility not operated by the company with which the State of Hawaii contracted, or alternatively, order the State of Hawaii to remove Plaintiff from any CoreCivic facility in Arizona. Similarly, Plaintiff fails to articulate any legal basis under

which the Court could order CoreCivic to house Plaintiff in a non-CoreCivic facility.

For the reasons discussed, Plaintiff's motions for injunctive relief will be denied.

**IT IS ORDERED:**

(1)     Count III is **dismissed** without prejudice.

(2)     Defendants Perez, Gawlik, and Guilin are **dismissed** without prejudice.

(3)     Defendants Lopez, Thomas, Griego, and CoreCivic must answer Counts I and II.

(4)     If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(5)     Defendants must answer the First Amended Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(6)     Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(7)     Plaintiff's motions for a preliminary injunction (Doc. 4) and a temporary restraining order (Doc. 6) are **denied**.

(8)     This matter is referred to Magistrate Judge Camille D. Bibles pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

…

…

…

…

…

TERMPSREF

1        (9)     This matter is assigned to the standard track pursuant to Rule 16.2(b)(3) of

2  the Local Rules of Civil Procedure and to the Mandatory Initial Discovery Pilot pursuant

3  to General Order 17-08.

4        Dated this 29th day of January, 2020.

Dominic W. Lanza
United States District Judge