**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Justin Fuller,<br><br>               Plaintiff,<br><br>v.<br><br>Christina Lopez, et al.,<br><br>               Defendants. | No.   CV 19-05818-PHX-DWL (CDB)<br><br><br>**ORDER** |

## INTRODUCTION

In June 2019, Justin Fuller ("Plaintiff") engaged in a sexual encounter with Christina Lopez.  At the time, Plaintiff was an inmate at the Saguaro Correctional Center ("SCC") in Eloy, Arizona, which is operated by CoreCivic, and Lopez was a correctional officer employed by CoreCivic.  The encounter occurred inside Plaintiff's prison cell.  Lopez, who was fired and prosecuted after CoreCivic officials became aware of the incident, contends the encounter was consensual while Plaintiff contends it was not.

In this civil rights action under 42 U.S.C. § 1983, Plaintiff contends that Lopez violated his Eighth Amendment right to be free of excessive force by sexually assaulting him.  Additionally, Plaintiff has asserted Eighth Amendment claims against CoreCivic, SCC warden Todd Thomas, and SCC assistant warden Ben Griego (together, "the CoreCivic Defendants").

Now pending before the Court are a motion for partial summary judgment filed by Plaintiff (Doc. 112) and a motion for summary judgment filed by the CoreCivic Defendants

1    (Doc. 115).  Plaintiff seeks a ruling that, for both legal and factual reasons, he did not

2    consent to the sexual encounter, while the CoreCivic Defendants advance various reasons

3    why they should not be held responsible for Lopez's conduct.  For the following reasons,

4    Plaintiff's motion is denied and the CoreCivic Defendants' motion is granted.

5    I.    Background

6           In Count I of his First Amended Complaint ("FAC"), Plaintiff asserts an Eighth

7    Amendment claim against Lopez premised on the allegation that she sexually assaulted

8    him on June 8, 2019, while she was a corrections officer and he was an inmate at SCC.

9    (Doc. 5 ¶¶ 3-66, 171-177.)  In Count II of the FAC, Plaintiff asserts Eighth Amendment

10   "supervisory liability" claims against the CoreCivic Defendants.  (*Id.* ¶¶ 178-185.)  On

11   screening, the Court determined that Plaintiff sufficiently stated Eighth Amendment claims

12   against these Defendants and directed them to answer the FAC.  (Doc. 8.)[1]

13   II.   Summary Judgment Standard

14          "The court shall grant summary judgment if [a] movant shows that there is no

15   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

16   of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

17   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

18   in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

19   1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

20   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

21   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is

22   improper where divergent ultimate inferences may reasonably be drawn from the

23   undisputed facts."  *Fresno Motors*, 771 F.3d at 1125.

24          A party moving for summary judgment "bears the initial responsibility of informing

25   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

26   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

27   _____

28   [1]    The Court dismissed three other named Defendants and Plaintiff's access-to-court
     claim.  (Doc. 8.)

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

III.   <u>Relevant Facts</u>

A.   **Objections**

The CoreCivic Defendants object to Plaintiff's separate statement of facts and Plaintiff's declaration, arguing that the cited material cannot be presented in an admissible form at trial and that the two filings are composed of Plaintiff's conclusory and self-serving testimony. (Doc. 126 at 1-2; Doc. 125 at 8-9.) To the extent the objection is that Plaintiff cannot testify about one of the core factual issues in this case—whether he consented to the sexual encounter with Lopez—because any testimony on this topic would be "self-serving," this objection lacks merit. *See, e.g., Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not

too conclusory."); *Cadle Co. v Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("[T]he appellee's attempt to discount Hayes' affidavits as 'self-serving' misses the mark. A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."); *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999) ("That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact.").

The Court also notes that the CoreCivic Defendants sometimes resort to sweeping generalizations about the inadmissibility of Plaintiff's proffered materials (*see, e.g.,* Doc. 125 at 9 ["Plaintiff's SSOF and affidavit are made up of speculative and conclusory assertions"]), as opposed to offering targeted objections to specific paragraphs and other portions of the proffered materials. This approach is insufficient—the Court need only consider specific objections to identified paragraphs within the affidavit and to specifically cited evidence. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666-67 (9th Cir. 2021).

The CoreCivic Defendants also object to paragraphs 4 and 8 of Plaintiff's separate statement, to the extent those paragraphs rely on Exhibits F and I, on the ground that those two exhibits were not attached to Plaintiff's separate statement. (Doc. 126 at 3–4, 7–8; Doc. 125 at 9.) In fact, Exhibit I is attached to Plaintiff's separate statement, albeit out of order. (Doc. 111-4.) As for Exhibit F, it appears to be missing, but paragraph 4 of Plaintiff's separate statement, which cites Exhibit F, also cites specific pages within Exhibit I, and that evidence is sufficient to support the assertion in paragraph 4. (Doc. 111 ¶ 4, citing "Ex. I at 88–93.") Accordingly, the CoreCivic Defendants' objections are overruled.

### B.   **The Incident**

At the relevant time, Plaintiff was a 31-year-old prisoner of the State of Hawaii Department of Public Safety who was assigned to SCC, a facility owned and operated by CoreCivic. (Doc. 108 ¶ 1; Doc. 128-1 ¶ 1; Doc. 108-9 at 228.) Plaintiff was housed in the Kilo housing unit, Bravo pod ("KB"), a general population housing unit. (Doc. 108 ¶¶ 1–2; Doc. 128-1 ¶¶ 1–2.)

Lopez began working for CoreCivic in July 2018.  (Doc. 108 ¶ 2; Doc 128-1 ¶ 2.)  At the relevant time, Lopez was 44 years old.  (Doc. 108-9 at 30.)

Around April 2019, Lopez began a friendship with Plaintiff, which involved talking about "just everything."  (Doc. 111-1 at 2; Doc. 131-3 at 9; Doc. 108-9 at 4 [RFA No. 6].)  Lopez confided in Plaintiff about her weight struggles and her family difficulties and told Plaintiff she was contemplating suicide.  (Doc. 108-9 at 62.)  Lopez began to pass letters to Plaintiff.  (Doc. 111-4 at 15; Doc. 131-4 at 5.)  Plaintiff also wrote letters to Lopez.  (Doc. 131-4 at 2.)

On June 8, 2019, at the beginning of the second shift, Captain Loomis held a shift meeting to notify all correctional personnel that the security cameras were temporarily down.  (Doc. 108 ¶ 104; Doc. 128-1 ¶ 104 [not disputing in relevant part].)  Captain Loomis told officers to be more alert and more aware of their surroundings since "Control" could not view them.  (Doc. 108 ¶ 110; Doc. 128-1 ¶ 110.)  The CoreCivic Defendants assert that when the security cameras go down due to technical difficulties or for maintenance, control room correctional staff cannot observe the camera views in real time; however, the security camera system still operates in recording mode, so video footage can be viewed after the fact.  (Doc. 108 ¶ 100; Doc. 128-1 ¶ 100 [not disputing in relevant part].)

Lopez was working the second shift, which started at 3:00 p.m.  (Doc. 108 ¶ 2; Doc. 128-1 ¶ 2.)  There is only one officer in the pod during a shift, and Lopez was the officer in KB during that shift.  (Doc. 108 ¶ 2; Doc. 128-1 ¶ 2; Doc. 108-7 at 15.)  The parties present different versions of what transpired during the second shift on June 8, 2019.

### 1.    Lopez's Version

At the start of her shift, Lopez informed Plaintiff that she just came from an all-shift meeting where prison employees had been told that all the security cameras were down.  (Doc. 133 ¶ 6.)  Around 7:25 p.m., Plaintiff told Lopez that they could have sex during pill call.  (Doc. 111-1 at 3.)  Plaintiff told Lopez to give him five minutes to get into his room.  (*Id*.)  Plaintiff's roommate was supposed to be the lookout.  (*Id*.)  Plaintiff went to his cell, Lopez joined him after a delay, and the pair then had consensual sex on the floor of the

- 5 -

cell.  (Doc. 108-7 at 12-13; Doc. 111-1 at 3; Doc. 133 ¶¶ 4, 8.)  Afterward, while Lopez and Plaintiff were getting dressed, another prisoner came to the door, looked in, and left.  (Doc. 108-7 at 13; Doc. 111-1 at 3.)  Lopez and Plaintiff hurried and cleaned up, and as soon as Lopez was dressed, she left the pod and went to the employee bathroom.  (Doc. 108-7 at 12, 14.)

## 2.  Plaintiff's Version

Around 3:00 p.m., just after the shift change, Lopez entered the pod and told Plaintiff that she had "good news"—the cameras were off.  (Doc. 111-4, transcript pages 40-41.)  Lopez told Plaintiff she wanted to have sex with him.  (*Id*.)  Plaintiff said he did not believe the cameras were off because, if they were, the facility would be in lockdown.  (*Id*.)  Lopez was adamant and said they just had a meeting that was set up by the warden.  (*Id.*, transcript pages 41, 45.)  Multiple times that afternoon and evening, Lopez made comments to Plaintiff about what was going to happen that night.  (Doc. 108-9 at 70.)

Later in the evening, Plaintiff went to Lopez and asked her what time pill call was going to be because his cellmate—who was using the bathroom—was supposed to receive pills but he wanted to use the telephone.  (Doc. 108-9 at 80.)  Lopez told him that she was about to announce pill time.  (*Id.*)  Lopez also said to him "you know I'm coming in there, right?"  (*Id*.)  Plaintiff didn't believe Lopez—he thought Lopez was kidding and kept telling her "Don't do that.  Don't do it.  Don't do it."  (*Id*.)

Around 7:25 p.m., Plaintiff's cellmate left to go use the telephone, and as he was leaving, he told Plaintiff that Lopez was right out front about to do a room search.  (*Id*.)  Plaintiff did not believe it because he was friends with Lopez and she would have told him if there was going to be a search that day.  (*Id*.)

Plaintiff's cellmate left, and then Lopez walked into Plaintiff's cell.  (*Id*. at 71.)  Plaintiff said to her, "You're fucking crazy," and he hopped off his upper bunk and told her she was going to get him in trouble.  (*Id*.)  Lopez shut the door behind her and turned off the light.  (*Id*.)  Plaintiff told her to get out, but she said no.  (*Id*.)  Lopez started to unbuckle her belt, and Plaintiff said to her "you can't be serious . . . we're going to get

snitched on." (*Id.*)  Plaintiff told her that he could go to the hole, but she would lose her job. (*Id.* at 71-72.)  Nevertheless, Lopez continued to remove her clothes. (*Id.*)

Lopez pulled her pants down to her knees, began rubbing herself, and walked toward Plaintiff. (*Id.* at 72.)  Lopez said to Plaintiff that if he did not have sex with her, she would make his life hell, but if he had sex with her, she would treat him "like a king." (Doc. 111-3 ¶ 14, adopting Doc. 5 ¶ 58; Doc. 108-9 at 72.)  Lopez untied Plaintiff's sweatpants and they fell to his ankles. (Doc. 111-3 ¶¶ 11-12.)  Lopez reached down under Plaintiff's boxer shorts, causing them to fall to his ankles, and she began groping Plaintiff, who was sitting on his locker; she continued to elaborate on the ways she would make life miserable for him, and she stated she would write him up every chance she got if he did not engage in intercourse with her. (Doc. 111-3 ¶¶ 13-14, adopting Doc. 5 ¶ 59.)  Plaintiff could not prevent his body's response and had an erection. (Doc. 111-3 ¶ 14, adopting Doc. 5 ¶ 61.)  Lopez turned and mounted Plaintiff with her back facing him; Plaintiff did not move. (Doc. 111-3 ¶¶ 14, 17, adopting Doc. 5 ¶ 62.)  At that moment, the only thing going through Plaintiff's mind was that something terrible was happening to him, but he had no choice. (Doc. 108-9 at 74.)

Plaintiff then saw someone looking into the room, he pushed Lopez off him, and he and Lopez jumped up and got dressed. (Doc. 108-9 at 74; Doc. 111-3 ¶¶ 14, 18, adopting Doc. 5 ¶¶ 65-66.)  Lopez told Plaintiff that if he said anything, he would go to the hole, she would make sure of it, and she told Plaintiff to find out who looked into the cell and that he needed to "handle that." (Doc 108-9 at 75.)  After Lopez left the cell, Plaintiff's cellmate returned, told Plaintiff that a prisoner looked in the room, and identified the prisoner. (*Id.*)  Plaintiff spent the night trying to convince the prisoner who looked in the cell not to say anything. (*Id.*)

## C.   **Subsequent Events**

On June 10, 2019, an anonymous prisoner submitted an Inmate Request form to the "Warden/Captain" stating that every night when Lopez works the second shift, Lopez and a prisoner named Fuller meet in the back on the top tier behind the pillar and talk for 20–

30 minutes or most of the night.  (Doc 108-4 at 117.)  The author stated that it is odd and "they have something going on or something, but if you check the cameras you will see what I am talking about!"  (*Id.*)  The author indicated that he did not know if Lopez was doing something for Plaintiff, but "it's very strange."  (*Id.*)

On June 12, 2019, Lieutenant Perez sent an email to Master Scheduler Scadden asking for the dates that Lopez had been posted in the Kilo Unit in the last 30 days.  (Doc. 131-7 at 6.)  Scadden responded with the list of dates.  (*Id.*)

On June 24, 2019, information was received from an unnamed "confidential" prisoner source that on June 8, 2019, Lopez engaged in sexual activity with Plaintiff in Plaintiff's cell.  (Doc. 110-1 at 6.)

CoreCivic's Policy 14-2, *Sexual Abuse Prevention and Response*, mandates a zero-tolerance policy toward all forms of sexual abuse and sexual harassment and sets forth CoreCivic's approach to preventing, detecting, and responding to such conduct.  (Doc. 108 ¶ 11; Doc. 128-1 ¶ 11.)  Policy 14-2 was meant to be a mechanism for compliance with PREA.  (Doc. 108 ¶ 12; Doc. 128-1 ¶ 12 [undisputed in relevant part].)[2]  When notified of an allegation of sexual abuse or harassment, SCC conducts an administrative investigation immediately, and if the allegation appears to be criminal, the Eloy Police Department is notified for investigation and referral for prosecution if warranted.  (Doc. 108 ¶ 24; Doc. 128-1 ¶ 24 [undisputed in relevant part].)

At the relevant time, M. Gawlik was the SCC facility investigator.  (Doc. 108-6 ¶¶ 2, 5.)  On June 24, 2019, upon receipt of the information from the unnamed prisoner source, Gawlik was assigned to investigate the PREA allegation of staff-on-prisoner sexual contact between Lopez and Plaintiff.  (*Id.* ¶¶ 5, 8-9.)

Gawlik first reviewed the video footage from June 8, 2019.  (Doc. 110-1 at 2.)  The video showed that at 7:10 p.m., Lopez and Plaintiff were speaking behind a pillar at the back of the pod.  (*Id.* at 6.)  At 7:20 p.m., Plaintiff walked to his cell and entered.  (*Id.*)  Shortly thereafter, Lopez walked toward Plaintiff's cell and waited nearby for

---

[2]    PREA refers to the Prison Rape Elimination Act of 2003, 34 U.S.C. § 30302 *et seq.*

approximately two minutes. (*Id.*) At 7:25 p.m., Plaintiff's cellmate left the cell, and Lopez then quickly entered the cell and closed the door. (*Id.*) At 7:28 p.m., a prisoner approached the cell and looked through the window. (*Id.*) Lopez remained in the cell with the light off before exiting at 7:29 p.m. (*Id.*) Lopez then left the pod and walked to the staff restroom. (*Id.*) At 7:32 p.m., Plaintiff's cellmate reentered the cell. (*Id.*) At 7:36 p.m., Plaintiff exited the cell and walked to the dayroom area, where he approached the prisoner who looked in the window. (*Id.*)

On June 24, 2019, after reviewing the video, Gawlik interviewed Plaintiff. (*Id.*) Plaintiff stated that he did not know why an officer was in his cell and that he must have been asleep. (*Id.*) Gawlik informed Plaintiff that video footage showed Lopez talking to him just before entering his cell; thus, he could not have been asleep. (*Id.*) Plaintiff had no response. (*Id.*) Gawlik determined that Plaintiff was uncooperative in the investigation and directed that Plaintiff be placed in restrictive housing. (*Id.*)

Gawlik then interviewed Plaintiff's cellmate. (*Id.*) The cellmate stated that he did not know why an officer would be in his cell with Plaintiff. (*Id.*) Gawlik believed that the cellmate had knowledge of the activity taking place in his cell; therefore, Gawlik placed the cellmate in restrictive housing pending an investigation. (*Id.*)

Around 4:00 p.m. on June 24, 2019, Warden Thomas conducted an interview of Lopez. (Doc. 108-1 ¶ 121.) Lopez reported that she entered Plaintiff's cell to conduct a cell search. (*Id.*) When Thomas asked why she conducted a cell search with the prisoner in the cell, she stated that they were just talking. (*Id.*) When asked why she conducted the search with the light off, she stated that she had a flashlight. (*Id.*) Lopez stated that she and Plaintiff had been talking for a while, but never got physical, and also told Thomas that Plaintiff had asked her to bring in contraband to the facility, but she never did. (*Id.* ¶¶ 121-122.) Thomas again asked Lopez if she engaged in sexual activity with Plaintiff while in his cell, and she stated that they were just talking. (*Id.* ¶ 123.)

After Warden Thomas's interview, Gawlik interviewed Lopez. (Doc. 110-1 at 7.) At first Lopez was hesitant, but then she admitted to having sexual intercourse with

Plaintiff on June 8, 2019.  (*Id.*)  Lopez told Gawlik that she had been having a relationship with Plaintiff for the last two months, but she had not been physical with him before the encounter.  (*Id.*)  Lopez stated that on the evening in question, Plaintiff approached her and stated they could have sex in his room during pill call, and she agreed.  (*Id.*)  Lopez described her version of the encounter in Plaintiff's cell, and she told Gawlik that the sexual conduct was mutual and not forced.  (*Id.*)

Upon Lopez's admission of sexual activity, Gawlik "immediately" referred the matter to the Eloy Police Department for a criminal investigation.  (*Id.*)  That evening, Officer Darrell Roach of the Eloy Police Department ("EPD") went to SCC to investigate. (Doc. 108 ¶ 158; Doc. 128-1 ¶ 158.)

Officer Roach interviewed Lopez.  (Doc. 108-7 at 3-5.)[3]  Lopez stated that she had a relationship with Plaintiff that involved a lot of talking.  (*Id.*)  Lopez stated that Plaintiff asked her to bring stuff into the prison for him, but she never did.  (*Id.*)  Lopez set forth her version of the June 8, 2019 encounter.  (*Id.*)  Lopez said that Plaintiff's roommate was supposed to be the lookout but did not do his job because another prisoner came to the door.  (*Id.*)  Lopez said that June 8, 2019, was the only time she had sex with Plaintiff.  (*Id.*)

Officer Roach then took Lopez to the EPD for further questioning by a sex crimes detective, Detective Mariscal.  (Doc. 108 ¶ 195; Doc. 108-7 at 12-16.)  During that interview, Lopez again said that she had sex with Plaintiff on June 8, 2019, and again provided her version of the encounter.  (*Id.*)  That same day, Lopez was fired.  (Doc. 108 ¶ 6; Doc. 128-1 ¶ 6.)

That evening (still June 24, 2019), Plaintiff was placed in a suicide watch cell.  (Doc. 128 ¶ 39.)

---

[3]      The CoreCivic Defendants assert that Officer Roach first interviewed Plaintiff, then Plaintiff's cellmate, and then Lopez.  (Doc. 108 ¶¶ 159-160, 169, 182.)  Plaintiff disputes the order of interviews.  (Doc. 128-1 ¶ 182.)  In the transcript of his interview with Plaintiff, Officer Roach stated that he had already received a statement from Lopez, and that he was "going to talk to her again, and I'm going to talk to your roommate, I believe."  (Doc. 108-9 at 12.)  This transcript supports that Roach interviewed Lopez, then Plaintiff, then Plaintiff's cellmate.

On June 25, 2019, Officer Roach interviewed Plaintiff with Gawlik present. (Doc. 108 ¶ 159; Doc. 108-9 at 11-13; Doc. 128 ¶ 40.) Officer Roach informed Plaintiff that Lopez gave a statement that she and Plaintiff had sex on June 8, 2019. (Doc. 108-9 at 12.) In response, Plaintiff stated that he never had sex with Lopez, that she never brought him anything, and that he never had any personal contact with her or received letters from her. (*Id.*) Plaintiff asked what was going to happen, and Gawlik stated that it was "looking like a possible PREA . . . that's why Eloy PD is here." (*Id.*) Plaintiff responded, "PREA . . . what do you mean? It look [sic] like I raped a broad . . . ?" (*Id.*) Gawlik then explained that because Plaintiff was a prisoner in their care, Lopez was the one who was liable, not him. (*Id.*) Plaintiff then admitted that he knew Lopez and talked to her but again stated he had no sexual contact with her and she did not bring anything in for him. (*Id.*)

Officer Roach then interviewed Plaintiff's cellmate. (Doc. 108 ¶ 169.) According to a subsequent report written by Officer Roach,[4] the cellmate stated that on June 8, 2019, he was in his room when Plaintiff told him his "girl" was coming by and asked if the cellmate could leave the room. (Doc. 108-6 at 26.) The cellmate stated he left the room and walked down to the dayroom to use the phone, and when he looked back, he saw Lopez walk into the room and shut the door behind her. (*Id.*) The cellmate said that Lopez was in the room for about five minutes and he did not know what was going on. (*Id.*) The cellmate stated that he was not a lookout for Lopez and Plaintiff. (*Id.*) The cellmate said that, while on the telephone, he saw another prisoner walk upstairs and look in the window of the cell, after which the prisoner walked back down the stairs and the cellmate asked him why he was looking in the cellmate's room. (*Id.*) The cellmate said he went back to the cell and Plaintiff was hiding under the bed. (*Id.*)

On June 25, 2019, Lopez was arrested and booked into jail. (Doc. 108 ¶ 209.) Lopez was later indicted for Unlawful Sexual Contact. (*Id.* ¶ 210.) Lopez eventually

---

[4] The CoreCivic Defendants did not submit the transcript of Officer Roach's interview with Plaintiff's cellmate.

pleaded guilty to Attempted Unlawful Sexual Conduct in a Correctional Facility, a Class 6 undesignated felony, in violation of A.R.S. § 12-1419.  (*Id.* ¶ 211.)

Under CoreCivic's Policy 14-2, an employee who learns of a sexual abuse allegation must ensure that the alleged victim is kept safe, has no contact with the alleged perpetrator, and is immediately escorted to the medical unit for evaluation.  (Doc. 108 ¶ 23; Doc. 128-1 ¶ 23 [undisputed in relevant part].)  In his administrative report, Galwik wrote that, on June 25, 2019, Plaintiff was taken to medical for a PREA screening and mental health interview.  (Doc. 116-1 at 8.)  The record includes a "Facility Emergency Anatomical Form," which documents that a nurse saw Plaintiff at 9:05 a.m. on June 25, 2019, and Plaintiff reported no injuries and that "nothing happened." (Doc. 108-9 at 206.)  A medical progress note dated 10:30 a.m., on June 25, 2019, documents that Plaintiff was seen by a mental health provider for approximately 20 minutes, during which time he complained that he had been in medical since last night and was cold.  (*Id.* at 212.)  Plaintiff stated that he did not recall anything and had a lawyer, so the less he said the better.  (*Id.*)  Plaintiff denied wanting to harm himself or others and denied the need for mental health services, and the provider assessed Plaintiff to be stable with low risk of suicidal ideation.  (*Id.*)

On June 27, 2019, an SCC employee named Charles K. filed an Incident Statement reporting that at 3:00 p.m. that day, Lopez called him at home and wanted to talk about the incident related to her termination.  (Doc. 131-7 at 3.)  Charles wrote that Lopez told him about two other COs who are compromised with prisoners in the Kilo Unit and identified the COs and the prisoners.  (*Id.*)  Charles wrote that Lopez told him she knows of more prisoner-officer relationships happening on the second shift and that she had been writing to two different prisoners.  (*Id.*)  Charles stated that Lopez asked him to pass a message to Plaintiff that she was okay and everything was going to work out; however, Charles told her he would not pass on a message.  (*Id.*)  Lopez told Charles she would just call Plaintiff's mother.  (*Id.*)

On June 27, 2019, Plaintiff's cellmate, who was still in solitary confinement, submitted a request stating that he had additional information he was now willing to

discuss.  (Doc. 116-1 at 8.)[5]  Gawlik interviewed Plaintiff's cellmate again.  (*Id.*)[6] According to Gawlik's administrative report, the cellmate stated that he was aware Plaintiff and Lopez were in a relationship but did not know the extent of it.  (*Id.*)  The cellmate stated that he had heard Plaintiff and Lopez say "I love you" to each another.  (*Id.*) According to the report, the cellmate stated that, on June 8, 2019, Plaintiff told him his "girl was coming to the room," so he asked the cellmate to leave and to make sure no one came back to the room.  (*Id.*)  The cellmate said that he saw another prisoner look in the cell window, and the cellmate confronted the prisoner and told him not to look in his room. (*Id.*)  The cellmate said that when he returned to the room, Plaintiff told him he had sex with Lopez.  (*Id.*)  The cellmate said he recalled other occasions when Plaintiff said he kissed Lopez in the chemical room/closet, and the cellmate said that, on several occasions, Lopez brought Plaintiff hamburgers and candy.  (*Id.*)[7]

CoreCivic's PREA investigation determined that Plaintiff "had compromised an SCC employee."  (Doc. 131-9 at 2.)  The investigation concluded with the following findings: Plaintiff sought out Lopez and begin talking to her; the two developed a friendship in April 2019; the two exchanged letters; Plaintiff wrote in his letters that he wanted to take their friendship to the next level; on many occasions, Plaintiff asked Lopez to bring contraband into the prison, but Lopez denied those requests; Lopez brought food into the prison for Plaintiff; and on June 8, 2019, Lopez and Plaintiff engaged in consensual intercourse.  (Doc. 108 ¶¶ 233-244.)  Apart from the findings that Lopez and Plaintiff developed a friendship and Lopez brought food into the prison for Plaintiff, Plaintiff disputes the investigation's conclusions.  (Doc. 128-1 ¶¶ 234, 236, 237-238, 241-242, 244.)

---

[5]     The CoreCivic Defendants did not submit a copy of the inmate request form.

[6]     The CoreCivic Defendants did not submit the transcript of the second interview with Plaintiff's cellmate.

[7]     In his deposition, Plaintiff denied that anything ever happened in the chemical room/closet.  (Doc. 108-9 at 67.)  However, Plaintiff also stated that, on occasion when getting his cleaning supplies, Lopez would unlock the chemical room and go into the room with him but never shut the door while they were inside.  (*Id.*)

Following the investigation, Plaintiff received disciplinary tickets for conspiracy and hindering for his attempt to introduce contraband into the facility. (Doc. 116-1 at 8.) Plaintiff also received a disciplinary ticket for "Failure to Follow" for providing false information during the PREA investigation. (Doc. 108 ¶ 231.) Plaintiff was found guilty of the disciplinary charges and issued 60 days of disciplinary segregation. (*Id.*)

On July 13, 2019, following a disciplinary hearing, Plaintiff filed a disciplinary appeal to Warden Thomas, explaining why he remained silent about the incident and asserting that he had asked to speak to a lawyer before speaking with investigators. (Doc. 131-8 at 12.) Plaintiff questioned why he was charged with hindering and failure to follow, noted that he ended up receiving a total of 120 days of discipline, and alleged that officials added more time than needed due to his initial refusal to cooperate. (*Id.*) The appeal response, dated July 16, 2019 and signed by Griego, concurred with the findings and the penalty imposed, and noted: "[I]nformation is clear. The evidence is there, and you know very well what you were doing." (*Id.*)

Meanwhile, on July 5, 2019, Plaintiff submitted a medical request form asking to be tested for sexually transmitted diseases "having been a victim of PREA." (Doc. 108-9 at 222.)

On July 9, 2019, Plaintiff filed a grievance on an Inmate Request form stating that Lopez walked into this cell without consent and forced him to have intercourse with her. (Doc. 131-3 at 12.) Plaintiff wrote that he told her it was not a good idea because they would get "snitched on," but Lopez told him that the cameras were off and she "had it covered." (*Id.*) Plaintiff wrote that after the incident, he was placed under investigation. (*Id.*) He also wrote that he is a victim under PREA and wanted to exhaust remedies for an eventual claim. (*Id.*)

On July 10, 2019, Plaintiff submitted another medical request form, which stated that it was his second request for an STD and HIV test "being a victim of PREA." (Doc. 108-9 at 226.) Plaintiff noted that his first request was submitted on July 5, 2019, but he

had not received a response.  (*Id.*)  The response, dated July 15, 2019, states that Plaintiff was seen that same day.  (*Id.*)

On July 11, 2019, CO Thronesbery filed an Incident Statement stating that on that date, he was working on the recreation yard when he heard Plaintiff "bragging about his sexual relationship with a staff member and how he was trying to get her to bring 'spice' in before they were caught."  (Doc. 108-4 at 121.)  Plaintiff disputes that he ever bragged to anyone about the sexual encounter with Lopez.  (Doc. 128-1 ¶ 232.)

On July 13, 2019, Plaintiff filed an Informal Resolution stating that Lopez had told him she wanted an intimate relationship with him by having intercourse, but he told her "no" because he did not want to get in trouble.  (Doc. 131-3 at 13.)  Plaintiff wrote that Lopez sexually assaulted him by grabbing his penis and kissing him, and—when he pushed her hands away—she said that if he didn't have sex with her, she would make his life a living hell and write him up every chance she got.  (*Id.* at 14.)  Plaintiff wrote that Lopez told him if he just had sex with her, she would treat him like a king.  (*Id.*)  Plaintiff wrote that they had intercourse, but he was traumatized.  (*Id.*)  Plaintiff explained that he saw someone looking into the cell window while he and Lopez were in the cell, after which Lopez told him to find out who that was or she would say Plaintiff raped her.  (*Id.*)  Plaintiff wrote that he found out who it was and asked the prisoner not to say anything.  (*Id.*)  Plaintiff wrote that he was then placed under investigation and was now being subjected to retaliation.  (*Id.*)  He asked to be allowed to make a PREA call and the ability to report the incident to an outside link.  (*Id.*)

The Informal Resolution Response, dated July 19, 2019 and signed by Assistant Warden Bradley, informed Plaintiff that "the PREA allegation was investigated in accordance with policy.  You were informed of the results of the investigation."  (Doc. 108-9 at 219.)

On August 2, 2019, Plaintiff proceeded to the next step in the grievance process and filed an Inmate/Resident Grievance form in which he alleged an Eighth Amendment violation by Lopez.  (Doc. 108-9 at 214.)  Plaintiff wrote that he did not consent to a sexual

relationship and that Lopez committed a sexual assault and failed to protect his safety.  (*Id.*) He wrote that Lopez entered his cell uninvited, demanded intercourse, threatened him, and used her authority to make his feel powerless.  (*Id.*)  Plaintiff wrote that he is now being retaliated against and that investigative officials and the wardens do not believe he is a victim.  (*Id.*)  Plaintiff requested that he be allowed to call an "outside source of PREA hotline" and transfer to another facility to avoid further punishment and stated he wanted to file a § 1983 lawsuit against Lopez and SCC for violating his constitutional rights.  (*Id.*)

The grievance response, dated August 12, 2019 and signed by Griego, stated "Official investigation was done on PREA per policy." (*Id.* at 215.)

On August 15, 2019, Plaintiff filed a third step appeal in which he stated that the PREA investigation was not done properly per policy.  (Doc. 131-13 at 2.)  Plaintiff wrote that he asked numerous times to call a PREA hotline source due to retaliation, but his attempts were thwarted.  (*Id.*)  Plaintiff explained that he tried to call a PREA hotline on July 8, 2019, but had to wait because an officer needed to add the telephone number to Plaintiff's phone list.  (*Id.*)  Plaintiff wrote that officials made him dial *777, which permitted him to leave a message for facility investigators, but he did not want to speak due to retaliation issues.  (*Id.*)  Plaintiff wrote that the PREA investigation was not properly done as evidenced by the 200 days of disciplinary time he was given along with retaliation almost every day by SCC investigators and officials.  (*Id.*)  Plaintiff alleged that he was raped and the investigation was not taken seriously.  (*Id.*)

In August 2019, Plaintiff was allowed to call the Southern Arizona Center Against Sexual Assault, at which time he reported that he had been in solitary confinement since June 24, 2019; that he received over 200 days of disciplinary time; that his inmate account was frozen; that he had been "interrogated" and harassed to comply with investigations on the sexual assault charges against Lopez; and that the warden and officers have told him that he is not a victim and no one will believe him.  (Doc. 131-15 at 25.)  Plaintiff was able to call the member crisis line for support thereafter.  (*Id.* at 7, 10.)

In December 2019, Plaintiff initiated this action.  (Doc. 1.)

IV.     Plaintiff's Motion For Partial Summary Judgment

    A.     **The Parties' Arguments**

Plaintiff seeks "a narrow finding of partial summary judgment in his favor, finding that he was legally incapable of consenting to sexual conduct under the circumstances, and that—in fact—he did not consent to Defendant Lopez's sexual aggressions, as the term 'consent' is understood under Ninth Circuit law applicable to guard-on-inmate sexual relations under the Eighth Amendment." (Doc. 112 at 6.)  Plaintiff seems to acknowledge that, under the Ninth Circuit's decision in *Wood v. Beauclair*, 692 F.3d 1041 (9th Cir. 2012), consent is a potentially viable defense when a prison guard is accused of violating the Eighth Amendment by engaging in sexual activity with an inmate.  (*Id.* at 1, 4.) Nevertheless, Plaintiff contends he is entitled to summary judgment on the issue of consent because "[t]he undisputed facts demonstrate that sexual contact did occur between [Lopez and Plaintiff], the sexual contact was unwanted, and [Plaintiff] expressed his unwillingness to [Lopez] prior to and during the assault." (*Id.* at 3.)

The CoreCivic Defendants oppose Plaintiff's motion. (Doc. 125.)  In a nutshell, the CoreCivic Defendants argue that although Plaintiff contends his sexual encounter with Lopez was non-consensual, his self-serving account "is plainly contradicted by objective, record evidence," including Lopez's testimony, CoreCivic's investigation, the EPD investigation, the security camera footage, Gawlik's memorandum, Plaintiff's letters to Lopez, and the statements of Plaintiff's cellmate.  (*Id.* at 11-15.)  The CoreCivic Defendants also point to the evidence suggesting that, a few days after the encounter, Plaintiff bragged to a fellow inmate about it.  (*Id.*)  Thus, the CoreCivic Defendants argue that, under *Wood*, Lopez is "expressly permit[ted] the defense of consent [because] no coercive factors are present." (*Id.*)  In fact, the CoreCivic Defendants argue that because there is no admissible evidence of a *lack* of consent, the Court should grant summary judgment in their favor on the consent issue.  (*Id.*)

Lopez also opposes Plaintiff's motion. (Doc. 132.)  Lopez contends that, in *Wood*, the Ninth Circuit "explicitly rejected a *per se* rule that would make prisoners incapable of

legally consenting to sexual relationships with prison officials" and instead "established a *rebuttable* presumption" of non-consent.  (*Id.* at 1-2.)  Lopez argues that the evidence here is sufficient to overcome that presumption.  (*Id.*)  Like the CoreCivic Defendants, Lopez contends the Court should grant summary judgment in her favor on the issue of consent, even though she is the non-movant, and "at a minimum" contends the issue of consent is "a disputed question of fact precluding judgment as a matter of law."  (*Id.*)

In reply, Plaintiff argues that the Ninth Circuit's decision in *Bearchild v. Cobban*, 947 F.3d 1130 (9th Cir. 2020), "partly superseded *Wood* insofar as *Wood* allowed prison guards to rebut the presumption that their sexual conduct with a prisoner amounted to sexual assault."  (Doc. 139 at 2-3.)  Thus, Plaintiff argues that, under current Ninth Circuit law (as well as under the revised Ninth Circuit model jury instructions), there is "no burden-shifting analysis, and no rebuttable presumption."  (*Id.* at 3.)  Alternatively, Plaintiff contends that even if the rebuttable presumption remains, a finding in his favor is warranted because "the details are irrelevant" and the power imbalance between a guard and inmate is inherently inconsistent with consent.  (*Id.* at 5-7.)

B.     **Discussion**

Plaintiff's motion for partial summary judgment is denied.  As an initial matter, the Court disagrees with Plaintiff's contention, raised for the first time in his reply, that the defense of consent is no longer available in § 1983 actions involving claims of improper sexual contact between inmates and guards in light of Ninth Circuit's decision in *Bearchild*. Putting aside the fact that this argument, if correct, would moot Plaintiff's motion—there would be no reason to move for partial summary judgment on the issue of consent if consent were an irrelevant consideration—the Court does not construe *Bearchild* as eliminating the potential viability of the consent defense.

Some background is in order.  In 2012, the Ninth Circuit decided *Wood*.  There, as here, a male inmate asserted a § 1983 claim against a female prison guard under the theory that the guard violated the inmate's Eighth Amendment right to be free of excessive force by engaging in sexual contact with the inmate.  692 F.3d at 1043.  One of the challenged

incidents in *Wood,* which was characterized in the opinion as "The First Incident of Sexual Harassment," involved the guard entering the inmate's cell and placing her hands on his groin in a sexual manner. *Id.* at 1044-46. The guard argued this encounter was consensual, and thus not violative of the Eighth Amendment, because it occurred in the course of a long-running romantic relationship between her and the inmate, while the inmate characterized the encounter as non-consensual and claimed he had attempted to push the guard away as it was happening. *Id.* On appeal, after the district court granted summary judgment in the guard's favor, the prisoner urged the Ninth Circuit to adopt "a per se rule that would make prisoners incapable of legally consenting to sexual relationships with prison officials." *Id.* at 1048. The Ninth Circuit declined to do so, stating that it was unwilling to "remove[] consent as a defense for Eighth Amendment claims." *Id.* Instead, the court held that "the better approach is a rule that explicitly recognizes the coercive nature of sexual relations in the prison environment," which takes the form of "a presumption that the conduct was not consensual" which the defendant "may rebut . . . by showing that the conduct involved no coercive factors." *Id.* at 1048-49. Applying this test, the court concluded the guard was not entitled to summary judgment on the issue of consent with respect to the first encounter because there was evidence the prisoner had told the guard to "back off" before the encounter, but she proceeded despite his protestations, and thus the prisoner had "established non-consent for the purposes of surviving summary judgment." *Id.*

Notably, in a different portion of the opinion, the Ninth Circuit analyzed the constitutionality of a different encounter between the guard and inmate, which was characterized as "The Second Incident Of Sexual Harassment." *Id.* at 1049-51. This encounter, unlike the first one, occurred after the romantic relationship between the inmate and guard had ended. *Id.* at 1049 ("Wood alleges that after he terminated their relationship, Martin entered his prison cell, reached her hand into his gym shorts, and stroked his penis."). When analyzing this encounter, the Ninth Circuit made no mention of the concept of consent—instead, it held that the inmate's allegations were sufficient to state an Eighth

Amendment claim because the challenged conduct satisfied both the subjective and objective prongs of the Eighth Amendment liability standard. *Id.* at 1050-51.

Eight years later, in 2020, the Ninth Circuit decided *Bearchild*. There, a male inmate asserted an Eighth Amendment-based § 1983 claim against a male prison guard after the inmate was allegedly "sexually assaulted during the course of a pat-down search." 947 F.3d at 1134. Specifically, the inmate alleged that, after he and another inmate were stopped by prison guards for pat-down searches while walking to an educational class, he was subjected to a search that "lasted for about five minutes and involved rubbing, stroking, squeezing, and groping in intimate areas." *Id.* at 1135. The inmate further alleged that the guard "then ordered him to pull down his waistband away from his body, stared at his penis, and asked, 'Is that all of you?'" *Id.* The guard, in turn, "vigorously disputed [the inmate's] characterization of the search and denied that it lasted five minutes [or] transgressed the boundaries of a permissible pat-down." *Id.* The matter proceeded to trial and resulted in a jury verdict in the guard's favor. *Id.* at 1138. The Ninth Circuit reversed, holding that the jury instructions governing the inmate's Eighth Amendment claim were flawed because, *inter alia*, (1) they "placed a greater burden on [the inmate] than our law requires" because they required the inmate to prove that the force was "excessive and unnecessary" but failed to inform the jury "that any act constituting sexual assault is by definition both excessive and unnecessary"; (2) they improperly suggested that the inmate "was required to show the pat-down caused physical injury in order to establish an Eighth Amendment violation, a proposition plainly contrary to our case law"; and (3) they were likely confusing because they instructed the jury to consider "the need to use the force," which may be a relevant consideration "when applied to a claim alleging that staff used excessive force to respond to an altercation" but is confusing in a sexual-assault case because "sexual assault does not require violent physical force, or indeed, any force" and "subtly suggests that some forms of sexual assault may be *de minimis*." *Id.* at 1145-46. Elsewhere in the opinion, the court announced that "[w]e now hold that a prisoner presents a viable Eighth Amendment claim where he or she proves that a prison staff member, acting

under color of law and without legitimate penological justification, touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner." *Id.* at 1144. The court also repeatedly noted that it viewed its holding as consistent with, and an extension of, *Wood*. *See, e.g., id.* at 1144 ("The decision we issue today follows our prior holdings in *Schwenk* and *Wood* . . . ."); *id.* at 1145 ("[S]et against the backdrop established by . . . *Wood* . . . we conclude that Instruction No. 12 misstated the elements necessary to establish liability for an Eighth Amendment violation arising from sexual assault."); *id.* (citing *Wood* for the proposition that "our case law dictates that all of the elements of a § 1983 sexual assault claim are established if a prisoner proves that a sexual assault occurred"); *id.* at 1148 ("*Wood* established legal principles applicable to Eighth Amendment cases dealing with sexual assault, and the instructions here impermissibly deviated from those standards.").

With this background in mind, the Court disagrees with Plaintiff's contention that *Bearchild* somehow "superseded *Wood* insofar as *Wood* allowed prison guards to rebut the presumption that their sexual misconduct with a prisoner amounted to sexual assault" and "effectuated a sea change in Ninth Circuit law." (Doc. 139 at 2-3.) There was no reason to consider the concept of consent in *Bearchild* because the guard in that case wasn't raising a consent defense—instead, he was denying that the alleged sexual encounter happened at all. Thus, although *Bearchild* contains passages that may suggest, by negative implication, that consent is no longer a valid defense to an Eighth Amendment sexual assault claim brought by an inmate against a guard—"We now hold that a prisoner presents a viable Eighth Amendment claim where he or she proves that a prison staff member, acting under color of law and without legitimate penological justification, touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner," 947 F.3d at 1144—those passages are properly understood as enunciating the liability standard in a case (unlike this one) where the defense isn't raising a consent defense.

- 21 -

This understanding is consistent with *Wood*.  As noted, Wood analyzed two different sexual encounters between the guard and inmate.  The guard only raised a consent defense with respect to the first encounter, and the portion of *Wood* analyzing that encounter contains an extensive discussion of the contours of the consent defense.  In contrast, *Wood* did not discuss consent when analyzing the second encounter—instead, it provided a formulation of the liability standard that mirrors the standard applied in *Bearchild*.

Plaintiff's interpretation of the interplay between *Bearchild* and *Wood* is also unpersuasive for other reasons.  At bottom, Plaintiff views *Bearchild* as overruling *Wood* to the extent *Wood* recognized the potential viability of a consent defense.  But this would be impossible under Ninth Circuit law—absent an "intervening higher authority, "three-judge panels are normally bound by the decisions of prior three-judge panels."  *Lair v. Bullock*, 798 F.3d 736, 745 (9th Cir. 2015) (citing *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc)).  Additionally, the *Bearchild* panel never suggested it was overruling *Wood* and instead repeatedly emphasized that it viewed its holding as consistent with *Wood*.  Under these circumstances, it would be bizarre to conclude that *Bearchild*, a case that has nothing to do consent, nevertheless silently overruled *Wood*'s core holding with respect to consent.

For these reasons, the Court views *Wood*'s discussion of consent as continuing to represent valid Ninth Circuit law, notwithstanding *Bearchild* and the recent issuance of a new Ninth Circuit model jury instruction for use in prisoner civil rights cases involving claims of sexual assault.[8]  Thus, to prevail on his motion for partial summary judgment, Plaintiff must show that, even when the disputed facts are viewed in the light most

---

[8] See Ninth Cir. Model Civil Jury Inst. 9.26A (added May 2020) ("Under the Eighth Amendment, a convicted prisoner has the right to be free from 'cruel and unusual punishments.'  To prove the defendant deprived [name of applicable plaintiff] of this Eighth Amendment right, the plaintiff must establish the following elements by a preponderance of the evidence: 1. [Name of applicable defendant] acted under color of law; 2. [Name of applicable defendant] acted without penological justification; and 3. [Name of applicable defendant] [touched the prisoner in a sexual manner] [engaged in sexual conduct for the defendant's own sexual gratification] [acted for the purpose of humiliating, degrading, or demeaning the prisoner].").

favorable to Lopez, no reasonable juror could find that Lopez has overcome *Wood*'s rebuttable presumption of non-consent and established that sexual encounter on June 8, 2019 was consensual.  Plaintiff has not made this showing.  Unlike in *Wood*—where the guard did not appear to dispute the inmate's contention that he said "no" immediately before the first encounter and instead premised her consent defense on the fact that the encounter occurred during a time period in which she and the inmate were, in general, romantically involved—here Lopez and the CoreCivic Defendants had proffered an array of evidence (including Lopez's account of the encounter) that, construed in Lopez's favor, would be sufficient to overcome the presumption of non-consent.

Finally, to the extent Lopez and the CoreCivic Defendants contend they are entitled to summary judgment in their favor on the issue of consent, that request is denied.  *See* 2 S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 193 (2021) (acknowledging that, "[e]ven in the absence of a cross motion, the trial court may grant summary judgment *for the nonmoving party* after giving notice and a reasonable opportunity to be heard" but emphasizing that "[t]he fact that the court denies relief to the moving party does not, by itself, show that summary judgment should be granted for the nonmoving party").  Plaintiff's version of the encounter, if believed by the jury, would be easily sufficient to establish a lack of consent.  Although Lopez and the CoreCivic Defendants contend that Plaintiff's account should be disbelieved for various reasons, including Plaintiff's pattern of inconsistent statements, such arguments are proper fodder for cross-examination, not summary judgment.

V.    The CoreCivic Defendants' Motion for Summary Judgment

The CoreCivic Defendants move for summary judgment on five grounds.  (Doc. 115 at 12-20.)  Each is addressed below.

A.    **Consent**

1.    The Parties' Arguments

The CoreCivic Defendants contend that "no reasonable jury would find in favor of Plaintiff" on his Eighth Amendment claim against Lopez—and thus, any derivative claim

against them must also fail—in light of the "internal inconsistency in the reports and descriptions he has made about the incident itself (totaling at least three stories), which are contrary to other witness reports and video evidence."  (Doc. 115 at 12-13.)

In response, Plaintiff contends that he "never consented" and the "evidence shows that Lopez was the aggressor, and offered Plaintiff favors in exchange for sex."  (Doc. 127 at 16.)

In reply, the CoreCivic Defendants reiterate their position that the undisputed evidence establishes that the encounter was consensual.  (Doc. 138 at 9-11.)

2.   Discussion

This issue is already addressed in Part IV.B above.  As noted, Plaintiff's version of the encounter, if believed by the jury, would be easily sufficient to establish a lack of consent.  Additionally, to the extent the CoreCivic Defendants argue that a lack of physical or actual injury defeats Plaintiff's claim, they are wrong.  *Bearchild*, 947 F.3d at 1145-46 ("The law does not require that [the guard's] actions 'caused harm to [the inmate],' in the form of physical or lasting emotional injury. . . .  [Requiring] physical injury in order to establish an Eighth Amendment violation [would be] a proposition plainly contrary to our case law.").  Thus, the CoreCivic Defendants are not entitled to summary judgment on this ground.

B.   **Thomas And Griego**

1.   The Parties' Arguments

The CoreCivic Defendants contend there is insufficient evidence to hold Thomas and Griego liable under a supervisory liability theory because there is no evidence they knew that Lopez posed a risk of sexual assault to inmates (her background check was clean and there were no prior incidents) and they did not personally direct or participate in Lopez's alleged violation.  (Doc. 115 at 13-17.)

Plaintiff does not, in the argument portion of his response, make any effort to address the individual liability of Thomas and Griego.

1   In reply, the CoreCivic Defendants contend that Plaintiff has conceded the issue of
2   Thomas's and Griego's liability by failing to respond to their arguments on that topic.
3   (Doc. 138 at 1-6.)

4               2.   Discussion

5       The Court agrees with the CoreCivic Defendants that Thomas and Griego are
6   entitled to summary judgment.

7       A prison supervisory official may be liable if he or she acted, or failed to act, in a
8   manner that was deliberately indifferent to a prisoner's Eighth Amendment rights.  *Starr*
9   *v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011); *Farmer v. Brennan*, 511 U.S. 825, 837
10  (1994).  Deliberate indifference exists where a prison official "knows of and disregards an
11  excessive risk to a prisoner's health or safety."  *Farmer*, 511 U.S. at 837.  The prison
12  official "must both be aware of facts from which the inference could be drawn that a
13  substantial risk of serious harm exists, and he must also draw that inference."  *Id.*  A
14  supervisor may be liable in his individual capacity under § 1983 "if there exists either (1)
15  his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal
16  connection between the supervisor's wrongful conduct and the constitutional violation."
17  *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).
18  Overt personal participation is not required for supervisory liability.  *Redman v. Cnty. of*
19  *San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).  A sufficient causal connection
20  can be shown where a supervisor "set[s]in motion a series of acts by others" or "knowingly
21  refus[es] to terminate a series of acts by others, which [the supervisor] knew or reasonably
22  should have known would cause others to inflict a constitutional injury."  *Starr*, 652 F.3d
23  at 1207-08 (quoting *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir.
24  2001)).

25      Here, the CoreCivic Defendants have submitted evidence showing that a clean
26  background check was conducted before Lopez's employment at SCC; that Lopez
27  successfully completed her training at SCC, including a two-hour PREA training course;
28  that Lopez passed CoreCivic's proficiency exam, which included questions related to the

PREA policy; and that Lopez never received any disciplinary or adverse employment action related to any aspect of her job performance before the June 8, 2019 incident. (Doc. 108-1 ¶¶ 82-94; Doc. 108-2 at 40, 43; Doc. 108-3 at 86; Doc. 116 at 107-120, 131-137.) The undisputed evidence also shows that, before the incident, Lopez was never found to be in violation of a CoreCivic policy or to have engaged in inappropriate relationships with prisoners. (Doc. 108-7 at 29-30.) Finally, Thomas and Griego both aver that they never received any complaints before June 8, 2019 suggesting that Lopez was acting inappropriately toward prisoners or engaging in any type of sexual misconduct and that Plaintiff did not notify them or any other officials that he had any notice, fear, or concern about Lopez's conduct or about a potential sexual assault. (Doc. 108-1 ¶¶ 95-96; Doc. 108-5 ¶¶ 43-44.) This evidence is sufficient to show that neither Thomas nor Griego was on notice that Lopez presented a substantial risk to Plaintiff such that they could be liable for deliberate indifference to Plaintiff's health or safety.

In his response, Plaintiff does not address his supervisory-liability claims against Thomas or Griego. Plaintiff thus fails to dispute any of the CoreCivic Defendants' evidence and arguments and fails to establish a material factual dispute as to these two Defendants' liability. *Celotex*, 477 U.S. at 323-25. Thomas and Griego are entitled to summary judgment. *Wood*, 692 F.3d at 1051 (affirming summary judgment for the supervisory defendants because there was no evidence they were on notice that the defendant officer presented a substantial risk to the plaintiff and the plaintiff did not disclose the defendant's actions to prison officials until after the incidents occurred).

## C. **CoreCivic**

### 1.   The Parties' Arguments

The CoreCivic Defendants contend there is insufficient evidence to hold CoreCivic liable under a *Monell* theory[9] because, to the extent "Plaintiff relies on Loomis' announcement that the cameras were down on June 8, 2019 to establish that CoreCivic had a custom, policy, or practice to allow the sexual assault of inmates," this was a single

---

[9]     *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

incident caused by a non-policymaker.  (Doc. 115 at 18-19.)  The CoreCivic Defendants further contend that, more generally, the undisputed evidence shows that "CoreCivic maintains a strict zero-tolerance policy against sexual misconduct" and that "SCC prison officials acted immediately" pursuant to this policy by firing Lopez and arranging for her to be criminally prosecuted.  (*Id.* at 17-19.)

In response, Plaintiff contends that CoreCivic may be held liable under *Monell* because "the failure of CoreCivic's PREA training was the moving force behind the rape." (Doc. 127 at 14-15, capitalization omitted.)

In reply, the CoreCivic Defendants accuse Plaintiff of "attempt[ing] to modify the legal theory underlying his *Monell* claim against CoreCivic" because the theory asserted in the FAC was a challenge to CoreCivic's decision to turn off the security cameras on the date of the incident, not a challenge to the sufficiency of CoreCivic's PREA training.  (Doc. 138 at 6-7.)  Alternatively, the CoreCivic Defendants argue the PREA training claim fails on the merits because "Plaintiff fails to articulate any deficiencies or omissions in CoreCivic's PREA training program," fails to "assert that these specific deficiencies or omissions *caused* the alleged violation," and merely offers an unsupported belief that the training program was inadequate.  (*Id.* at 7-8.)  The CoreCivic Defendants further contend there is no evidence that Thomas and Griego have an unofficial policy of deeming all sexual contact between corrections officers and inmates to be consensual.  (*Id.* at 9.)

### 2.   Discussion

To support a § 1983 claim against a private entity performing a traditional public function, a plaintiff must show that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell* to private entities acting under color of law.  Thus, Plaintiff must show that: (1) he suffered a constitutional injury; (2) CoreCivic had a policy or custom; (3) the policy or custom amounted to deliberate indifference to

1   Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind

2   the constitutional injury.  *Monell*, 436 U.S. at 691-94.

3        Here, the analysis is complicated by the fact that Plaintiff has not always been clear

4   about his theory of *Monell* liability and the "policy, custom, or practice" giving rise to that

5   claim.  In the FAC, Plaintiff accuses all three of the CoreCivic Defendants of "Supervisory

6   Liability for Failure to Protect."  (Doc. 5 ¶¶ 178-85.)  All of the factual allegations

7   underlying this claim deal with the announcement on June 8, 2019 that the security cameras

8   had been turned off, which the FAC characterizes as a "falsehood" and "an intentional

9   gamble with the safety of all involved." (*Id.*)  This portion of the FAC does not, in contrast,

10  allege any shortcomings in CoreCivic's PREA training program, much less that those

11  unidentified shortcomings had anything to do with Plaintiff's injury.  Indeed, to the extent

12  the FAC mentions PREA at all, it asserts that a series of "PREA Violations" occurred after

13  the incident in question, with all of the alleged violations touching upon prisoner access to

14  PREA hotlines and/or how Plaintiff was treated during SCC's investigation of the June 8,

15  2019 incident. (*Id.* ¶¶ 113-32, 140-53, 188.)  Nowhere does the FAC allege that CoreCivic

16  failed to train its staff to avoid engaging in sexual contact with inmates. (*Id.*)

17       Given this backdrop, CoreCivic understandably interpreted Plaintiff's *Monell* claim

18  as being premised on the no-security-cameras announcement on June 8, 2019.  Thus, in its

19  motion, CoreCivic identified various reasons why such a theory would be insufficient to

20  survive summary judgment under *Monell*. (Doc. 115 at 18-19.)  CoreCivic also argued

21  that, to the extent Plaintiff was traveling under a more traditional "custom, policy, or

22  practice" theory, such a claim would fail because CoreCivic "maintains a strict zero-

23  tolerance policy against sexual misconduct." (*Id.* at 18.)

24       In his response to the summary judgment motion, Plaintiff suggests his *Monell* claim

25  against CoreCivic is not based on the no-cameras announcement but instead on deficiencies

26  in CoreCivic's PREA training program.  Indeed, in the "Law" section of his response,

27  Plaintiff cites *Canton v. Harris*, 489 U.S. 378 (1989)—which is one of the leading

28  precedents on failure-to-train liability—in support of the contention that a municipality

may be held liable under § 1983 for failing to implement a training program (Doc. 127 at 13-14), and in the next section of the response, Plaintiff uses the heading "The Failure of CoreCivic's PREA Training Program Was the Moving Force Behind The Rape" before proceeding to offer various arguments about why CoreCivic's PREA training program was flawed (*id.* at 14-15).  To the extent the camera announcement is mentioned at all, it is simply mentioned in the introduction as something that exacerbated the risk of harm posed by the alleged flaws in the PREA training program.  (*Id.* at 1 ["CoreCivic PREA *practice* is to tell staff when the cameras are down, relying on the honor system to protect prisoners from being raped . . . ."].)

The Court agrees with the CoreCivic Defendants (Doc. 138 at 6-7) that Plaintiff may not, at this late stage of the litigation, pursue *Monell* liability under a failure-to-train theory that is not mentioned in his operative complaint and is markedly different from the theory of liability that is asserted in that complaint.  *See, e.g., Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court."); *Wasco Prods. Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (quotation omitted); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991) ("Nearly eight months after Evans filed her amended complaint, she attempted to change her theory . . . in her response to McDonald's motion for summary judgment. . . .  We do not find the district court committed error in refusing to treat this new claim."); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) ("[T]his claim was not raised in Fisher's second amended complaint but, rather, was raised in his response to the defendants' motions for summary judgment and, as such, was not properly before the court.").  For this reason alone, CoreCivic is entitled to summary judgment.

Alternatively, the failure-to-train claim fails on the merits.  As the Supreme Court has noted, an entity's "decision not to train certain employees about their legal duty to

1   avoid violating citizens rights" may, "[i]n limited circumstances," "rise to the level of an
2   official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51,
3   61 (2011). However, "culpability for a deprivation of rights is at its most tenuous where a
4   claim turns on a failure to train." *Id.*

5          This tenuousness is pronounced when dealing with the type of failure-to-train at
6   issue here—a claim that a prison or law enforcement agency should have trained its
7   employees not to commit sexual assaults. In *Flores v. County of Los Angeles*, 758 F.3d
8   1154 (9th Cir. 2014), a women who was sexually assaulted by an on-duty police officer
9   asserted a § 1983 claim against the county and county sheriff due to their alleged "failure
10  properly to train deputy sheriffs to ensure that Sheriff's [d]eputies do not sexually assault
11  women that [d]eputies come in contact with." *Id.* at 1156. In particular, the plaintiff faulted
12  the defendants for "the absence of language in the Sheriff's Department Manual that would
13  instruct deputies not to sexually harass or sexually attack women with whom they come
14  into contact." *Id.* at 1160. The Ninth Circuit affirmed the dismissal of this claim, holding
15  that it was "not plausible on its face" because "[g]iven that the penal code prohibits sexual
16  battery, it is not plausible that inclusion in the Manual of the language that [Plaintiff]
17  proposes would have prevented the assault . . . . If the threat of prison time does not
18  sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not
19  to commit sexual assault will provide such deterrence, and therefore failure to include such
20  instruction does not constitute deliberate indifference absent a longstanding pattern of such
21  criminal behavior." *Id.* The court also cited, with approval, the Tenth Circuit's observation
22  in *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998), that "[s]pecific or extensive
23  training hardly seems necessary for a jailer to know that sexually assaulting inmates is
24  inappropriate behavior." *Id.*

25         Here, it is undisputed that CoreCivic had a PREA training program. (Doc. 108 ¶ 26
26  ["All CoreCivic employees receive pre-service and annual in-service training on
27  CoreCivic's zero-tolerance PREA policy."]; Doc. 128-1 ¶ 26.) It is also undisputed that
28  this program includes explicit warnings that "all forms of sexual activity between inmates

and employees . . . are prohibited" and that "[a]ny employee in violation of the zero-tolerance policy is subject to administrative disciplinary action and criminal charges." (Doc. 108-1 ¶ 14; Doc. 128-1 [undisputed].)  These are, of course, the very warnings that were missing in *Flores*, yet the failure-to-train claim in that case was still deemed implausible on its face.

At any rate, although Plaintiff accuses CoreCivic of adopting a "'wink-and-a-nod' attitude towards preventing prison rape" (Doc. 127 at 2) and appears to criticize two specific aspects of CoreCivic's PREA training program—first, the practice of warning staff members that they may be victims of prisoners; and second, the practice of imposing punishment against prisoners who fail to cooperate with sexual assault investigations (Doc. 127 at 14-15)—Plaintiff makes no effort to establish that changes in those areas of training would have prevented the incident in this case.  And without such evidence, Plaintiff cannot survive summary judgment.  *Cf. Shumpert v. City of Tupelo*, 905 F.3d 310, 318-19 (5th Cir. 2018) ("Plaintiffs have failed to present evidence that additional training would have prevented Shumpert's injuries.  The undisputed record indicates that TPD policies included detailed training about how to respond to a call for officer assistance and the requirements for officers to announce their presence to a suspect. . . .  Plaintiffs have not satisfied the requirements for municipal liability under *Monell*, so the district court was correct in granting summary judgment . . . ."); *Serna v. City of Bakersfield*, 2019 WL 2164631, *7 (E.D. Cal. 2019) ("Bakersfield's police officers did undergo training on dealing with individuals with mental illness. Plaintiffs fail to show how using the updated version of Learning Domain 37 would have changed the training program from one exhibiting deliberate indifference to citizens' constitutional rights to one that would have trained its officers to prevent the constitutional deprivation that allegedly resulted here, such that the failure to employ the updated training module could be characterized as the moving force behind the constitutional violation.").  *See generally Canton*, 489 U.S. at 391-92 ("[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury.  Thus in the case at hand, respondent must still prove that the

deficiency in training actually caused the police officers' indifference to her medical need. . . . To adopt lesser standards of . . . causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

    D.   **Damages**

        1.   The Parties' Arguments

The CoreCivic Defendants argue that "[i]f Plaintiff's claim survives summary judgment, then his damages must be limited to nominal damages, not to exceed $1.00, because he cannot establish any actual injury," as evidenced by Plaintiff's failure to seek mental health treatment and admission that his PTSD was not caused by the incident. (*Id.* at 19.)

In response, Plaintiff notes that physical injury is not required to state an Eighth Amendment sexual assault claim under Ninth Circuit law and argues that the extent of his damages, including his "ongoing emotional and psychological harm," should be resolved by the jury. (Doc. 127 at 15-18.)

In reply, the CoreCivic Defendants contend that because the encounter between Plaintiff and Lopez was consensual, Plaintiff "must establish an actual injury to seek damages." (Doc. 138 at 9-11.)

        2.   Discussion

The Court finds it unnecessary to resolve this issue because it has now granted summary judgment in favor of all three CoreCivic Defendants on other grounds.

    E.   **Punitive Damages**

        1.   The Parties' Arguments

The CoreCivic Defendants seek summary judgment on Plaintiff's claim for punitive damages because "there is no evidence that Defendants' conduct was driven by evil motive or intent, nor is there evidence to show that Defendants' actions were conducted with reckless or callous disregard for Plaintiff's constitutional rights." (Doc. 115 at 20.)

In response, Plaintiff contends that "punitive damages are appropriate in this case precisely because Defendants exhibited reckless or callous indifference to Plaintiffs' constitutional rights.  Defendants fail to explain how waiting approximately two weeks to initiate an investigation even after learning of irregularities in the surveillance footage does not amount to reckless or callous indifference to Plaintiff's rights.  Most glaringly, Defendants fail to explain how penalizing Plaintiff for being a victim does not amount to callous disregard for his constitutional rights under the Eighth Amendment." (Doc. 127 at 17.)

In reply, the CoreCivic Defendants contend that it was not reckless or callous to fail to initiate a sexual assault investigation on June 10, 2019 because the report received on that date did not allege any sexual contact (and the report was, in any event, immediately investigated); that they took immediate action upon receiving the report of June 24, 2019, which was the first report that included an allegation of sexual contact; and that Plaintiff's claims of retaliation cannot give rise to punitive damages because Plaintiff's retaliation claim was dismissed at screening and Plaintiff did not, at any rate, experience unlawful retaliation.  (Doc. 138 at 11-12.)

## 2. Discussion

The Court finds it unnecessary to resolve this issue because it has now granted summary judgment in favor of all three CoreCivic Defendants on other grounds.

…

…

…

…

…

…

…

…

…

1    Accordingly,

2    **IT IS ORDERED:**

3    (1)    The reference to the Magistrate Judge is withdrawn as to Plaintiff's motion

4    for partial summary judgment (Doc. 112) and the CoreCivic Defendants' motion for

5    summary judgment (Doc. 115).

6    (2)    Plaintiff's motion for partial summary judgment (Doc. 112) is **denied**.

7    (3)    The CoreCivic Defendants' motion for summary judgment (Doc. 115) is

8    **granted**.   Thus, CoreCivic, Thomas, and Griego are **dismissed** from this action with

9    prejudice.

10    (4)    The remaining claim is the Eighth Amendment sexual assault claim against

11    Lopez.

12    (5)    Magistrate Judge Deborah M. Fine having been randomly drawn, this action

13    is referred to Magistrate Judge Fine to conduct a settlement conference on Plaintiff's

14    remaining claim.

15    (6)    Counsel for the parties must arrange to jointly call Magistrate Judge Fine's

16    chambers at (602) 322-7630 within **14 days** of the date of this Order to schedule a date for

17    the settlement conference.

18    Dated this 8th day of March, 2022.

19

20    _____

21    Dominic W. Lanza
      United States District Judge

22

23

24    Cc: Magistrate Judge Fine

25

26

27

28

- 34 -